UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 2:20-CR-00100-DCLC-CRW |
| | ) | |
| vs. | ) | |
| | ) | |
| YANIER N. TELLEZ, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter came before the Court on April 5, 2022, during an evidentiary hearing on Defendant's Motion to Suppress [Doc. 53].[1] Defendant sought suppression of certain evidence obtained during a November 2017 traffic stop of Defendant in Lee County, Florida, conducted by Deputy George Camacho with the Lee County Sheriff's Office. At the hearing, the Government provided the testimony of Deputy Camacho, along with video footage of the traffic stop. For the following reasons and as explained by the Court during the evidentiary hearing, the Defendant's Motion to Suppress [Doc. 53] is **DENIED**.

**I.    FACTUAL FINDINGS**

The relevant evidence presented at the hearing is summarized as follows. On November 14, 2017, Deputy Camacho conducted a traffic stop after he observed Defendant, who was driving a silver Mercedes, fail to maintain his lane. Deputy Camacho advised Defendant of the reason for the stop, asked him for his driver's license, and asked him to accompany him back to his patrol

---

[1]    Despite the passing of the deadline to file pretrial motions on December 17, 2021, the Court found good cause to grant Defendant leave to file a Motion to Suppress and provided the Government a chance to respond prior to the suppression hearing [Doc. 52].

1

vehicle.[2] While Deputy Camacho conducted the business of the stop at his patrol vehicle, he engaged in conversation with Defendant and asked him where he was going. Defendant indicated he was going to Miami to see friends and to fix the tires on his car, which was already in Miami, and then going back to Tampa. Deputy Camacho testified that he found this to be unusual, because it was approximately 3:00 p.m., which would put Defendant in Miami's rush-hour traffic around 5:30 p.m. To then take the time to see friends, fix a car, and make the drive back to Tampa, according to Deputy Camacho, would be an "all day thing" and seemed odd.

After running the license plate number on the silver Mercedes, Deputy Camacho discovered the registered owner was a Hispanic male by the name of Lazaro Adrian Quintana Martinez. But Defendant stated it belonged to his girlfriend's female friend. Deputy Camacho testified that Defendant was behaving in a nervous manner—he was talkative, moving around a lot, and bending over to touch his shoes and/or pants. When Deputy Camacho later inquired a second time as to the ownership of the vehicle and specifically asked about Lazaro Martinez, Defendant stated he did not know Lazaro, but he could be the boyfriend of the female he thought owned the vehicle. Despite his statement that he did not know Lazaro, he offered to call him to confirm he had permission to drive the vehicle.

Defendant Camacho then sought consent to search the vehicle. He asked Defendant if he had any weapons, drugs, or large amounts of cash in the vehicle, to which Defendant responded in the negative and told him he was welcome to search it. Deputy Camacho confirmed that he had permission to search, and Defendant agreed. In the vehicle, Deputy Camacho found expensive merchandise, such as an iPad, shoes, and jewelry, which all appeared to be new but were not in

---

[2] Although Deputy Camacho and Defendant communicated exclusively in Spanish, Deputy Camacho provided a thorough interpretation of the majority of the conversation. Defendant did not contest Deputy Camacho's translation of the conversation.

2

bags and there were no receipts. Based on Defendant's stated travel plans, the high-end jewelry he had, the merchandise in the vehicle, and Defendant's apparent nervousness, Deputy Camacho testified he felt like some type of identity fraud was being committed.

While standing on the passenger side of the patrol vehicle, Deputy Camacho asked Defendant if he had his wallet and Defendant pulled his wallet out of his pocket. Deputy Camacho said, "let me see it for a moment" and Defendant handed his wallet to Deputy Camacho. Deputy Camacho looked inside the wallet and discovered three Vanilla Visa gift cards with five-digit numbers handwritten on the back of each card. He found this to be significant because, based on his training and experience, Vanilla gift cards are often used for credit card fraud and the five-digit numbers typically correspond to various zip codes, which are necessary to use a fraudulent credit card. When Deputy Camacho asked Defendant where he got the gift cards, Defendant initially said he bought them at a mall, but he later stated he got them at a gas station in Tampa from a man named Roberto who offered to sell them at half price.

Deputy Camacho asked the Defendant if he could swipe the cards to determine if they were fraudulent. Defendant initially said yes, but when Deputy Camacho grabbed the magnetic scanner out of his glove department, Defendant withdrew consent. Nonetheless, Deputy Camacho swiped the gift cards and determined the information from the magnetic strips did not correspond with the numbers on the front of the card, indicating that the gift cards were fraudulent. Upon this information, Deputy Camacho had Defendant put his hands on the top of his head, searched him for weapons, detained him in the back of the patrol vehicle, and read him his *Miranda* rights.

While detained, Defendant continued to speak with Deputy Camacho and gave consent for the search of his phone. Defendant unlocked the phone and Deputy Camacho looked through it while standing next to Defendant. On the browsing history, Deputy Camacho found a Bank

3

Identification Number ("BIN") search website, which he recognized to be a website commonly used to identify banking information for a particular credit card.

Deputy Camacho testified that his Captain conducted a subsequent search of the vehicle and discovered two thumb drives, which Defendant affirmatively denied ownership of. After obtaining a search warrant for the thumb drives, Deputy Camacho looked at the contents and found over 500 account numbers and credit card numbers, a file titled "Tenesi" or some type of Spanish abbreviation of Tennessee, some files with the name Adrian which coincided with the registered owner of the vehicle, and another file relating to "new credit."

## II. PARTIES' POSITIONS

In his motion and at the hearing, Defendant sought suppression of any evidence obtained after, or as a result of, Deputy Camacho's search of his wallet and/or cell phone.[3] Such evidence includes (1) the gift cards found in the wallet, (2) any statements made by Defendant while detained in the back of the patrol vehicle, (3) Defendant's browsing history, (4) and the information on the thumb drives discovered during the subsequent search of the vehicle. In support, Defendant argued Deputy Camacho did not obtain valid consent to search his wallet, because he merely handed his wallet over in submission to Deputy Camacho's apparent lawful authority. Defendant also asserted that his consent to the search of his phone was rendered invalid because he was in the back of the patrol vehicle at the time he consented.

In response, the Government argued the search of the wallet was done with implied consent, was not a response to coercion or lawful authority, and, based on Defendant's actions, Deputy Camacho could reasonably conclude that Defendant was consenting to a search of the

---

[3] Defendant did not dispute the constitutionality of the traffic stop or the initial search of the vehicle.

4

Case 2:20-cr-00100-DCLC-CRW   Document 64   Filed 04/08/22   Page 4 of 8   PageID #: 245

wallet. Additionally, the Government claimed Defendant never revoked his express consent to a search of the vehicle and, as a result, the subsequent search which revealed the thumb drives was valid. As to the search of the content on the thumb drives, the Government stated Defendant lacked standing to challenge the search because he expressly denied ownership and, moreover, the search was conducted pursuant to a warrant.

### III. ANALYSIS

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). "[A] search conducted without a warrant issued upon probable cause is per se unreasonable…subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quotation marks and citations omitted). One such exception is a search predicated on consent. *Id*.

To be valid, consent to search must be "voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009). The burden is on the government to demonstrate by a preponderance of the evidence that consent was valid. *Id*. "[T]here is no 'magic' formula or equation that a court must apply in all cases to determine whether consent was validly and voluntarily given." *United States v. Worley*, 193 F.3d 380, 387 (6th Cir. 1999). The Court must conduct a "fact-specific inquiry" based on the "totality of the circumstances." *Id*. at 386.

In conducting this inquiry, the Court must consider the following: "the age, intelligence, and education of the individual; whether the individual understands the right to refuse consent; whether the individual understands his or her constitutional rights; the length and nature of

5

detention; and the use of coercive or punishing conduct by the police." *Id*. (citation omitted). However, "[v]oluntary and knowing consent does not require that [an individual] be advised that he is entitled to refuse consent." *United States v. Bradley*, 163 F. App'x 353, 357 (6th Cir. 2005); *see United States v. Collins*, 683 F.3d 697, 702 (6th Cir. 2012) ("While the fact that [an individual] did not understand he could refuse consent to search is a factor to consider in determining whether consent was voluntary, police do not have to inform an individual of his right to refuse to consent to a search."). In addition, the Court must also consider the individual's non-verbal conduct. *See United States v. Taylor*, 142 F.3d 438 (6th Cir. 1998); *see also United States v. Hinojosa*, 606 F.3d 875, 882 (6th Cir. 2010) ("there is no requirement that consent must be verbally given.")

Based on the totality of the circumstances, the Court found that Defendant voluntarily consented to the search of his wallet. It is undisputed that Defendant consented to the search of the vehicle. In the same way and immediately thereafter, Defendant handed over his wallet to Deputy Camacho. To be sure, Deputy Camacho's choice of words—"let me see it for a moment"—and Defendant's lack of a verbal response does not vitiate the voluntariness of the consent. *See United States v. Gant*, 112 F.3d 239, 243 (6th Cir. 1997) ("it is not necessary for an officer specifically to use the term 'search' when he requests consent."); *see also United States v. Cowan*, 704 F. App'x 519, 525 (6th Cir. 2017) ("consent can be given without speaking a word."); *see also Gale v. O'Donohue*, 824 F. App'x 304, 318 (6th Cir. 2020) (holding that a "talismanic phrase" is not required to find consent.). In light of the vehicle search and conversation between Defendant and Deputy Camacho about the expensive merchandise immediately prior to his request for Defendant's wallet, a reasonable person would interpret such request as seeking consent to search the wallet for evidence of illegal activity. *Jimeno*, 500 U.S. at 251 (applying an objective reasonableness test to determine scope of consent).

Defendant's subsequent consent for Deputy Camacho to scan the gift cards and near immediate revocation of that consent when he saw the physical scanner also evinces his knowledge of the right to refuse consent.[4] As to the remaining relevant factors, Defendant maintained a cooperative demeanor throughout the entirety of the stop; he appeared to communicate effectively with Deputy Camacho, who spoke Spanish and even recognized that Defendant spoke in a Cuban dialect; the traffic stop and search occurred in daylight on a public street; Deputy Camacho did not threaten or coerce Defendant into consenting to the search of his wallet; Defendant was able to freely roam about and was not physically restrained; and at the time of consent, Defendant had not been detained for a lengthy period of time. Considering the totality of the circumstances, including Defendant's prior verbal consent to search the vehicle, Defendant's handing over of his wallet constituted voluntary consent to a search of the wallet.

Likewise, the Court found that Defendant voluntarily consented to the search of his cell phone. Deputy Camacho asked to search the phone and Defendant told him which phone was his, entered the password, and even offered to show Deputy Camacho videos and/or pictures on his phone. Again, he consented to this search after he had previously revoked consent to scan the gift cards, indicating he was aware that he could refuse consent. The search of the phone also did not occur long after the initial stop. The Court further found that Defendant's statements while detained in the patrol vehicle were knowingly and voluntarily made after he was read his *Miranda* rights and, therefore, the statements were admissible.

---

[4] Although Deputy Camacho proceeded to scan the gift cards despite Defendant's revocation of consent to do so, Defendant lacked any expectation of privacy in the magnetic strips on the back of the apparently fraudulent cards. *United States v. Bah*, 794 F.3d 617, 630 (6th Cir. 2015) ("[T]he scans of the magnetic strips of the credit and gift cards did not involve physical intrusions into constitutionally-protected areas.").

7

Finally, the Court concluded Defendant never revoked consent to search the vehicle. Therefore, the subsequent search by Deputy Camacho's Captain leading to the discovery of the thumb drives was valid, regardless of whether it was categorized as an inventory search or not. As for the search of the content on the thumb drives, the Court found Defendant lacked standing to challenge the search and, regardless, the search was conducted pursuant to a valid search warrant.

## IV. CONCLUSION

Accordingly, for the reasons stated at the evidentiary hearing and as reiterated herein, Defendant's Motion to Suppress [Doc. 53] is **DENIED**.

SO ORDERED:

s/ Clifton L. Corker
United States District Judge